UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
07-CV-2384(JMR/FLN)

Robert Chester, Regional      )
Director of the Eighteenth    )
Region of the National Labor  )
Relations Board, for and on   )
behalf of the National Labor  )
Relations Board               )            ORDER
                              )
        v.                    )
                              )
Eichorn Motors, Inc.          )

This matter is before the Court on petitioner's motion for a temporary injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) ("Section 10(j)"). Petitioner seeks an injunction barring respondent from violating employees' rights under the National Labor Relations Act, 29 U.S.C. § 151 et. seq. ("the NLRA"). Petitioner's motion is granted in part and denied in part.

I.  Background

Respondent, Eichorn Motors, Inc. ("Eichorn"), is a General Motors ("GM") dealership located in Grand Rapids, Minnesota, which succeeded to the ownership of Swanson Motors on May 1, 2006. Swanson Motors had been a union shop operating under a collective bargaining agreement with the United Auto Workers International Union (the "Union"). Petitioner, Robert Chester, on behalf of the National Labor Relations Board ("the Board"), accuses Eichorn of engaging in a series of unfair labor practices since taking over the business.

The Board first brought charges against Eichorn in a November

14, 2006, hearing conducted before Administrative Law Judge ("ALJ") Paul Bogas.   Judge Bogas found Eichorn engaged in multiple activities which unlawfully undermined the Union's role as its collective bargaining representative.   (GC Ex. 4 at 18-19.) Subsequent to this hearing, the Board brought a second complaint against Eichorn.   The Board's second complaint underlies the petition before this Court.

A.   Unilateral Policy Changes

The Board's petition charges Eichorn with making several unilateral changes to its employees' wages and working conditions without notifying the Union.   As a successor dealership to Swanson Motors,[1] the Board agrees Eichorn could have unilaterally set its own employment terms and conditions when it commenced operations on May 1, 2006.[2] But subsequent to commencing operations, Eichorn was required to bargain with the Union before changing any terms of the collective bargaining agreement.[3]   Thus, the Board claims unilateral changes made after May 1, 2006, violate NLRA Section

---

[1] An employer is considered a "successor," obligated to bargain with the union, if: (1) a majority of the successor employees in the bargaining unit were employees of the predecessor; and (2) the successor employer is performing essentially the same work as the predecessor employer.   NLRB v. Burns Int'l Sec. Serv., Inc., 406 U.S. 272, 280-81 (1972).   All parties agree Eichorn meets these criteria.

[2] See Burns, 406 U.S. at 294-95.

[3] See Id.; In re Cora Realty Co., LLC, 340 NLRB 366, 367-368 (2003).

8(a)(5).

The Board cites four specific unilateral acts:

1.   On August 1, 2006, Eichorn changed its wage policy, and began paying technicians a single hourly wage rate instead of applying the former three-tier wage rate system.

2.   On November 28, 2006, Eichorn changed its holiday pay policy.  Eichorn required employees to work the day before and the day after a holiday to receive holiday pay, with no exceptions for excused absences, as had been allowed previously.

3.   Eichorn implemented a Customer Satisfaction Index ("CSI") Policy[4] on November 29, 2006.  Under this policy, employees who did not reach zone average CSI scores were subject to discharge.

4.   On November 30, 2006, Eichorn changed its training pay policy, eliminating the prior practice of paying technicians double-time for hours spent training.

Eichorn denies these are policy changes, claiming these policies were in place when it commenced operations.  And in each cited instance, Eichorn states it simply clarified or notified the employees of differences between its policies and those of Swanson Motors.

It further claims, even considering these to be changes, the dealership's employees were not harmed by the new policies.  For

---

[4]The CSI is a measure General Motors uses to assess the quality of a dealership's customer service.  When a GM dealer services a vehicle under a GM warranty, GM sends a service satisfaction survey to the customer.  The survey asks the customer to rate the service technician's performance.  Customers surveys are sent to GM, which sends Eichorn a detailed monthly CSI report.  This report compares Eichorn's scores to the average CSI scores of the zone, region, and nation.  The report also includes the scores of each individual Eichorn service technician.  (Tr. 21-30, GC Ex. 6).

example, its practice of paying all mechanics at the higher incentive rate had little impact, because mechanics had historically qualified for - and had been paid - that rate. Thus, Eichorn claims "no harm, no foul."

      B.   <u>Direct Dealing and Restraining Union Involvement</u>

The Board's second group of charges accuse Eichorn of dealing directly with employees, thus bypassing the Union. The Board claims this interfered with or restrained employees' involvement with the Union, violating NLRA Section 8(a)(1).

The Board states this first occurred when Eichorn's General Manager, Michael Coombe ("Coombe"), and its Parts and Services Director, David Brown ("Brown"), asked mechanic-employees James Ossefoort, David Cogger, and Robert Anderson how they wanted to get paid for the Thanksgiving holiday in November, 2006. Coombe told them they would get holiday pay the "Eichorn way." Eichorn responds by saying this discussion was the dealership's attempt to avoid additional unfair labor practices by clarifying how payment would be made. Eichorn further claims the Union actually participated in the conversation because Cogger, the shop steward, was present.

The Board's second alleged instance of direct dealing occurred on December 9, 2006, when Eichorn's Vice President, Mitch Eichorn, offered mechanic Anderson a four-year contract he claimed would be better than the Union contract, including better benefits and

4

wages.  Anderson states Mitch Eichorn backed his offer with the
following threats:  (1) that he wanted to have Anderson work for
him but not the Union, and he wanted Anderson to choose between the
Eichorn way and the Union way; (2) that if Anderson decided to go
the Union way, he would not be working for Eichorn Motors; (3) that
he would be offering Anderson a four year contract with more wages
than the Union contract; and (4) that Anderson's bannering[5] showed
Anderson was for the Union way.  (Tr. 399-400).

Eichorn responds by claiming Mitch Eichorn was not its agent
on this occasion, since he did not have a role in the dealership's
day-to-day operations.   According to Eichorn, Mitch Eichorn
explicitly advised Anderson he was not acting on behalf of Eichorn
Motors during the conversation.

The Board's third allegation of direct-dealing occurred during
conversations between Parts and Services Director Brown and
mechanic Ossefoort on January 3 and 4, 2007.  On January 3, Brown
told Ossefoort, "you may win the battle but you are not going to
win the war."  (Tr. 169-71.)  Ossefoort claims this statement
implied his union support was futile.  Ossefoort's employment was
terminated that day.  The next day, when he returned to Eichorn to

---

[5]Starting November 14, 2006, the day Judge Bogas's hearing
began, Anderson, Cogger, and Ossefoort engaged in bannering over
their lunch breaks.  The three employees walked up and down the
sidewalk holding signs that read:  "Honk for union support.  UAW
349."  This occurred three or four times a week prior to their
terminations.  (Tr. at 125-26.)

pick up his tools, he said to Brown, "I guess you got what you wanted, you got rid of me."  Brown responded, "It's not what I wanted.  It's what we want.  Team players."  (Tr. 177.)

Eichorn replies Brown's "you may win the battle" comment responded to a derogatory comment Ossefoort made about Coombe. Eichorn further claims the "team player" comment referred to Ossefoort's unwillingness to assist co-workers, showing he was not a team player.  Eichorn offered examples of numerous occasions where Ossefoort refused or failed to assist co-workers or refused to follow supervisors' directions.

C.  Wrongful Discharges

The Board's third group of charges claim Eichorn fired all of its active union members, effectively ousting the Union from the company, in violation of NLRA Section 8(a)(3) and (4).  As noted above, Ossefoort's employment was terminated on January 3, 2007; that same week, Eichorn also fired Cogger and Anderson.  All three were known union supporters; each had participated in the November, 2006, hearing before Judge Bogas.

Eichorn states there were legitimate business reasons for terminating each mechanic, and that it would have taken those actions regardless of union activities.  Concerning Ossefoort, Eichorn claims he was terminated for a number of reasons: negative attitude, unwillingness to help co-workers, unacceptable work quality, and walking off the job.  Brown recommended firing

6

Ossefoort on January 3, 2007, because Ossefoort left the dealership early contrary to General Manager Coombe's instruction telling him to stay and complete required training.  Ossefoort refused, and walked off the job site.

Eichorn says Anderson's termination was based on poor work quality, his attitude, lack of teamwork, and his work performance, including low CSI scores.  Eichorn claims Cogger was fired for his poor work history, for failing to show up for work on time, for refusing to train, for falsifying his records, and for the decline in his CSI scores.

Eichorn also offers the fact that it has disciplined and terminated the employment of non-union employees of the dealership since its acquisition.  It further points to mechanic Wade Eckert, who participated in union bannering around the time of the terminations, yet retained his employment.

Eichorn hired replacement mechanics subsequent to these terminations.  The Court takes note of the fact that Grand Rapids, Minnesota, is not a large metropolitan area.  From this fact, the Court considers, first, there are not a large number of open mechanic's jobs at automobile dealerships at any given time in Grand Rapids, and second, once released from such a position, re-employment in the same community, in a comparable position, may be difficult.

A hearing concerning the Board's second set of charges, those

made after Judge Bogas's hearing, was held before ALJ John Clark on April 24, 25, and 26, 2007. Judge Clark's decision is pending, and whenever it is issued, it will be recommended to the Board for consideration and adoption. The Board's counsel advised the Court these steps may take anywhere between six months and two years.

As the Board pursues its glacial processes, it apparently feels compelled to turn to the Court seeking "emergency" relief, and asks the Court to opine, on a limited record - as compared to its already-conducted days' long hearings - and enjoin Eichorn from engaging in the very same practices heard before Judge Clark. The Board also asks the Court to rescind any unilateral policy changes Eichorn Motors has instituted, and reinstate the three employees allegedly terminated in violation of the Act.

## II.  Discussion

Section 10(j) allows the Board to petition a district court for temporary injunctive relief pending resolution of an underlying case. The Act provides, in pertinent part:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

8

In considering a request for a preliminary injunction under Section 10(j), the Court must consider the well known factors for preliminary relief set forth in <u>Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109 (8th Cir. 1981).  <u>Sharp v. Parents in Community Action, Inc.</u>, 172 F.3d 1034, 1037-38 (8th Cir. 1999).  These are:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

<u>Dataphase</u>, 640 F.2d at 114.

A.  <u>Threat of Irreparable Harm to the Movant</u>

To obtain Section 10(j) injunctive relief, the Board must first show "the case presents one of those rare situations in which the delay inherent in completing the adjudicatory process will frustrate the Board's ability to remedy the alleged unfair labor practices."  <u>Sharp</u>, 172 F.3d at 1039.  The irreparable harm to be demonstrated is not harm to individual employees; the Board must show a "harm to the collective bargaining process or to other protected employee activities if a remedy must await the Board's full adjudicatory process."  <u>Id.</u> at 1038.  Should the Board fail to make this showing, the Court need not consider the remaining three <u>Dataphase</u> factors.  <u>Id.</u> at 1039.  The Court finds the Board has sustained its burden, in part.

Judge Bogas's findings demonstrate Eichorn's history of thwarting the Union.  Evidence adduced before this Court gives

further evidence of the company's attempts to coerce its Union employees to renounce the Union, and ally themselves with the "Eichorn way." When Eichorn's efforts failed, it fired a number of its active Union employees. These firings certainly undermined the company's Union support, impairing the negotiation process.

The evidence before this Court shows negotiations between the company and the Union have diminished, and are now intermittent at best. This is the type of irreparable harm contemplated by Section 10(j). NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996) (harm to employees from delay in bargaining and the diminution of union support is immeasurable).

In fine, the company has eviscerated the bargaining unit, having terminated its entire team of active Union supporters. Eichorn pushes mechanic Wade Eckert to the fore, arguing he is a Union supporter and remains employed. Eichorn's position is undermined, however, by evidence showing Eichorn was unaware of Eckert's Union support when it fired the other three Union mechanics. As opposed to the others, Eckert did not testify in the November NLRB hearings, nor was he on the collective bargaining negotiation team. Apparently, his Union activity was limited to one or two bannering sessions, (Tr. 196.), whereas the other three discharged employees were well-known Union supporters, all of whom testified at the November hearing before Judge Bogas.

For the purposes of this motion, the Board has demonstrated

10

that Eichorn's dealings with active Union supporters, and its apparent attempt to stifle the Union, render current employees unlikely to advance their Union support out of fear of retaliation. See Pye ex rel. NLRB v. Excel Case Ready, 238 F.3d 69, 74-75 (1st Cir. 2001).

Absent interim action, the Court finds remedial measures may be impaired, because the discharged employees may not be available for reinstatement after the painfully extended time which may elapse before the Board issues a final order.  Bloedorn v. Francisco Foods, Inc., 276 F.3d 270, 299 (7th Cir. 2001).  The Court finds that, absent interim reinstatement of at least some Union supporters, the Union will experience irreparable harm to its ability to bargain collectively.

The Board has failed to clear that same high hurdle of proving irreparable harm, however, concerning the policy changes it seeks to rescind.  Even if Judge Clark finds, and the Board finally adopts a conclusion finding, Eichorn's wage, holiday pay, training pay, and CSI score concerns are policy changes in violation of the NLRA, these can be easily and fully compensated by monetary damages to any affected employees.  See Sharp, 172 F.3d at 1040 (no irreparable harm where there is an adequate monetary remedy). Further, the Board has failed to produce any evidence showing these issues could not be dealt with as a part of the revitalized collective bargaining process.

11

B.   <u>Probable Success on the Merits</u>

Section 8(a) of the NLRA declares it an unfair labor practice for an employer:

> (3) by discrimination in regard to the hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; . . . .
> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

29 U.S.C. § 158(a)(3) and (4).

In attempting to determine whether Ossefoort's, Anderson's, or Cogger's terminations violate Sections 8(a)(3) or (4), the Court applies the test set forth in <u>Wright Line</u>, 251 NLRB 1083 (1980), <u>enfd.</u> 662 F.2d 899 (1ˢᵗ Cir. 1981).  <u>See</u> <u>Pace Indus., Inc. v. NLRB</u>, 118 F.3d 585, 590 (8ᵗʰ Cir. 1997).  The Board must first make a prima facie showing that Union activity was a "motivating factor" in the discharge.  <u>Id.</u>

To do so, the Board must establish:  (1) the employee was engaged in a protected activity; (2) the employer knew the employee was engaged in a protected activity; and (3) the protected activity was a substantial or motivating factor in the discharge.  <u>Wright Line</u>, 251 NLRB at 1089.  If the Board makes this prima facie showing, the burden shifts to the employer to demonstrate it would have reached the same decision absent the Union activity.  <u>Id.</u> Even though an employer may have legitimate justifications for its action, such action may still constitute an unfair labor practice

if anti-Union animus was also a motivating factor.  <u>Pace</u>, 118 F.3d at 591.

The Board easily meets its burden with regard to the first two <u>Wright Line</u> factors.  Each discharged employee was an active Union supporter, and all testified before Judge Bogas.  Coombe and Brown, the Eichorn supervisors who fired the three, were present at the hearing, showing they were aware of the employees' Union activity. Having made this finding, the Court must determine whether their protected activity was a substantial or motivating factor in each employee's discharge.  While a full discussion will likely issue from the ALJ after his three-day trial, the Court finds from the totality of the circumstances that the Board will succeed on the merits regarding Anderson and Cogger, but not in the case of Ossefoort.

Prior unfair labor practices by the respondent can be considered as evidence of unlawful motive in this case.  <u>Control Services, Inc.</u> 315 NLRB 431, 432 (1994) (and cases cited therein). Judge Bogas found Eichorn's General Manager Coombe threatened both Anderson and Ossefoort with discharge because of their Union activity.  (GC Ex. 4 at 10).  Judge Bogas also found Coombe unlawfully interrogated Cogger about his Union support. (GC Ex. 4 at 12.)

Eichorn insists all three employees were discharged for various performance problems, including low CSI scores, rather than

13

for Union involvement.  But the Board has put forth evidence of
disparate treatment:  Employee Wade Eckert's CSI scores were the
lowest of all the technicians in November and December, (GC Ex. 6
& 14), and he was not terminated.  Eckert was not an open Union
supporter, and did not testify before Judge Bogas.

Each mechanic who testified at the hearing was discharged.
Eckert was not.  Based on this evidence, the Court finds Eichorn's
proffered justification pretextual.  See Yesterday's Children, Inc.
v. N.L.R.B., 115 F.3d 36, 49 (1st Cir. 1997).  The Court considers
it highly unlikely that none of the three discharges were motivated
by the employees' Union activity.  Thus, the Court finds the Board
is likely to succeed on the merits of its claims regarding the
discharges of Anderson and Cogger.

Ossefoort's discharge is distinguished from his colleagues.
Evidence at the hearing before this Court was explicit:  on the day
Ossefoort was terminated, Eichorn's General Manager Coombe directly
instructed Ossefoort that he was to remain at work and complete
required training.  This was a legitimate instruction, and was part
of Ossefoort's duties.  Ossefoort refused the order and left work.
This evidence was uncontradicted. From this evidence, the Court
finds Ossefoort deliberately disregarded a supervisor's valid
order, and walked off the job without authorization.  These facts
constitute valid reasons for an employee's termination, whether or
not the person is employed subject to a collective bargaining

14

agreement.  Eichorn has met its burden regarding Ossefoort; he will
not be reinstated.

    C.  <u>Balance Between Harms</u>

    The Court must next balance the potential for harm to the
moving party against any potential harm to the nonmoving party in
the event the injunction issues.  <u>Dataphase</u>, 640 F.2d at 114.
Eichorn claims it would be irreparably harmed if it must reinstate
Anderson and Cogger, because it will have to release those
employees it hired to fill their places.  This claimed
inconvenience does not outweigh the irreparable harm to the
collective bargaining process.    Eichorn's proffered argument,
if accepted, would turn the injunction's remedial aspect on its
head.  This Court has preliminarily found the newly-employed
mechanics were wrongfully retained after the company's wrongful
terminations of those whose jobs they filled.  Of course, undoing
the company's wrong will displace the new-hired mechanics.  But it
was the company's improper acts which put them there in the first
place.

    Under these conditions, Eichorn's proffered harm is seen as
the piffle it is.  The Court rejects it, and finds this factor,
too, favors the Board.

    D.  <u>Public Interest</u>

    Finally, the Court must consider the public interest.  Here,
the Board offers newspaper articles it claims prove the public is

interested in this matter.  The Court rejects such hearsay.  <u>See</u>
Fed. R. Evid. 802.

But the Court finds the public interest is clear.  Indeed, it
has been set forth by Congress.  It was Congress, the people's
voice, which elucidated a strong public interest when it enacted
the NLRA in an effort to protect employees' rights to organize and
bargain collectively.  "The [public] interest at stake in a section
10(j) proceeding is the . . . interest in the integrity of the
collective bargaining process."  <u>Bloedorn</u>, 276 F.3d at 300
(quotation omitted).  Thus, the public interest favors granting the
temporary relief.

III.  <u>Conclusion</u>

Having balanced the factors relating to the issuance of
temporary injunctive relief, the Court grants the Board's petition
for a temporary injunction under Section 10(j) of the NLRA.
Accordingly, IT IS ORDERED that:

1.  Within five days of the date of this Order, Eichorn Motors
shall offer Bob Anderson and David Cogger, in writing, immediate
and full reinstatement to their former jobs, and with the same
terms and conditions of employment as existed at the time of their
discharges.

2.  Eichorn Motors shall post copies of this Order at its
Grand Rapids, Minnesota, facility in all locations where notices to
employees are customarily posted.  Said postings shall be

16

maintained during the Board's administrative proceeding free from all obstructions and defacements, and agents of the Board shall be granted reasonable access to the dealership to monitor compliance with this posting requirement.

3.  Upon request, Eichorn Motors shall grant to agents of the Board reasonable access to all appropriate records for examination and reproduction, to permit monitoring of its compliance with this Order.

Dated:  August <u>14</u>, 2007

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States Chief District Judge